No. 2860

Second Circuit

GOLDSBY v. LOWREY

(April 8, 1927. Opinion and Decree.)
(May 13, 1927. Rehearing Refused.)

(*Syllabus by the Court*)

1. **Louisiana Digest—Automobiles—Par. 8.**

Physical facts speak for themselves and are entitled to great weight in determining the circumstances connected with a collision between two automobiles on a public highway; but the conclusions of witnesses based on the examination of markings made by automobile tires on the graveled road are not sufficient to overcome the positive testimony of unimpeached witnesses who were present in the collision and testify to facts seen by them as they happened.

2. **Louisiana Digest—Appeal—Par. 625.**

Findings of fact by a trial court will not be disturbed on appeal unless manifestly erroneous.

3. **Louisiana Digest—Parent and Child—Par. 12.**

Fathers and mothers are answerable for the offenses and quasi offenses committed by their minor children.
Civil Code, Art, 237.

4. **Louisiana Digest — Minors — Par. 177, 178, 180.**

An exception to the right of plaintiff to maintain an action in her own right and as natural tutrix of her minor child, on the ground that she is under the age of 18 years and married without the consent of her parents, is properly overruled where, before trial of the exception, plaintiff was duly emancipated as provided by law and proof of such emancipation is made.
Mullen vs. Gause, 161 La. 461, 109 South. 31.

Appeal from the Eleventh Judicial District Court of Louisiana, Parish of DeSoto. Hon. Hal. A. Burgess, Judge.

Action by Mrs. Opal Goldsby, et al., against John W. Lowrey.

There was judgment for plaintiffs and defendant appealed.

Judgment affirmed.

Pegues & Pegues, of Mansfield; Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, attorneys for plaintiffs, appellees.

Lee & Bell; Lee & Williams, of Mansfield; Craig, Bolin & Magee, of Shreveport, attorneys for defendant, appellant.

STATEMENT OF THE CASE

REYNOLDS, J. This is a suit by Mrs. Opal Goldsby, widow of Lawton Goldsby, deceased, in her own behalf and as natural tutrix of her minor child, Ralph Goldsby, issue of her marriage with Lawton Goldsby, deceased, to recover damages in the sum of $10,000.00 for herself and $10,000.00 for said minor, from the defendant, John W. Lowrey, growing out of a collision between an automobile driven by defendant's minor son, Jack Lowrey, and an automobile driven by the deceased, Lawton Goldsby, on a public highway in DeSoto parish, and in which collision the deceased, Lawton Goldsby, received injuries that caused his death.

The collision is alleged to have been the result of gross negligence on the part of defendant's minor son.

The damages are itemized as follows: For the pain and suffering endured by the deceased from his injuries, $4443.00; loss by Mrs. Goldsby of the love and support of her husband, $7283.33; loss by the minor, Ralph Goldsby, of the love and care of his father, $7561.83; value of automobile destroyed by the collision, $433.34; and medical and funeral expenses for the deceased, $278.50.

Plaintiff alleges that the proximate cause of the collision was the fast and reckless driving by defendant's minor son, Jack Lowrey, in a Hudson automobile on his, the driver's left-hand side of a public road known as the Bayou Pierre Road, at a point about seven miles from Mansfield on May 13, 1925.

Defendant filed an exception to the capacity of the plaintiff to stand in judgment, on the ground that at the time the suit was filed she was an unemancipated minor under the age of 18 years, and had been married to the deceased without the knowledge or consent and against the wishes of her parents.

On trial of this exception the plaintiff introduced in evidence a notarial act signed by the parents of the plaintiff, dated December 8, 1925, and recorded December 9, 1925, emancipating plaintiff from all the disabilities of minority.

Defendant objected to the admission of the act in question on the ground that it did not confer upon plaintiff the right to sue or be sued and that if it did so then it could not relate back to the bringing of the suit so as to remove her then want of capacity to stand in judgment.

The exception to plaintiff's capacity to sue was overruled and defendant excepted.

Thereupon defendant filed an answer denying that at the time of the collision his son was driving his automobile recklessly or carelessly and denying that any act of his son was the proximate cause of the collision and alleged that the collision was caused by the driving by the deceased, Lawton Goldsby, of his own automobile unskillfully and on his own left-hand side of the road.

On these issues the case was tried and there was judgment in favor of Mrs. Opal Goldsby individually for $4217.77 and in her favor as natural tutrix of Ralph Goldsby for $4217.77, and the defendant appealed. Plaintiff has answered the appeal and asked that the judgment be increased to $15,000.00.

## OPINION
## EXCEPTION OF WANT OF CAPACITY TO SUE

The exception to plaintiff's capacity to stand in judgment was properly overruled, for the reason that it appears from the evidence adduced on the trial of the exception that after the exception was filed plaintiff had been duly emancipated from all the disabilities of minority by notarial act executed by her father and mother.

The emancipation removed the defect at which the exception was levelled.

"Minor, who attained majority during pendency of appeal and continued prosecution of suit in his own right, held to have cured lack of authority, if any, under Civil Code, Article 221, as amended by Act 252 of 1920, of mother who brought suit in his behalf."

Mullen vs. Gause, 161 La. 461, 109 South. 31.

## ON THE MERITS

The first question to be decided in the proper determination of the case is the point at which the automobiles came in contact with each other.

As to this, Mrs. Goldsby, Mr. and Mrs. Stone, and Aubrey Goldsby, who, with the deceased, Lawton Goldsby, constituted the occupants of the Ford automobile that collided with the Hudson automobile driven by defendant's son, testified positively that the car in which they were riding was on the extreme right-hand side of the road, going towards Mansfield, and within from twelve to fourteen inches of the embankment on the right-hand side of the road in the direction in which they were traveling.

Their testimony as to this fact was accepted as true by the trial judge who, in his reasons for judgment, said, as to this:

"In considering the testimony of the plaintiff: Lloyd Stone, on page 59 of the evidence, testified that just as they were on top of a hill beyond where the collision occurred, that he saw the Hudson coming down the road at an excessive rate of speed; and that he called Lawton Goldsby's attention and warned him to be careful. That Lawton Goldsby at once cut off his motor and coasted down the hill and steered his car over to his extreme right side of the road and was running between ten and fifteen miles per hour near or about twelve inches of the ditch. That just before they had reached the top of the hill coming this way, Jack Lowrey struck them with the Hudson, which seemed to be going between fifty and sixty miles per hour. Aubrey Goldsby, who was riding on the front seat, stated that

he did not see the Hudson until it was right upon them, but it was running very fast. Mrs. Lloyd Stone testified that she heard the conversation between her husband and the deceased, and that Lawton Goldsby had complied with the request and had turned to his right side of the road and was approaching the top of the hill at a slow speed. She is certain that the Hudson, which was seen by her just before the contact, was running very fast, and that they were struck by the Lowrey car. See evidence, pages 89 and 90. Mrs. Opal Goldsby, on page 121 of the evidence, supports the testimony of the other witnesses in regard to the conversation that was had between Stone and her husband. She stated that they were running very slow and on the right side of the road and that her husband had complete control of his car at the time it was struck by the Hudson, which was running very rapidly."

The testimony of the four named witnesses that the Ford car was driven by plaintiff's husband, was on the right-hand side of the road in the direction in which they were traveling at the time of the collision is corroborated by the fact that the contact between the two automobiles was not a head-on collision as to either automobile.

If, as contended by defendant, the automobiles were approaching each other, both on the same side of the road, the collision would have been a "head-on" one.

As to this, the trial judge said in his written opinion:

"If Goldsby had been on his wrong side and the two cars approached as defendant contends, should they have met where they did, the impact would have been by the front end of both cars, as they would have almost formed the letter V. The evidence of plaintiff and defendant with the pictures taken together show that

Goldsby could not have been on the wrong side in making that curve. See the pictures where the beaten path of travel is shown. The center of the road at this point is where people drive, and it is not cut, as most curves are, because it can't be done."

The testimony of Mrs. Goldsby, Mr. and Mrs. Stone and Aubrey Goldsby is further corroborated by the fact that pieces of glass, pieces of fishing-pole, a crutch of the deceased, and the two automobiles landed on the right-hand side of the road going to Mansfield, and by the further fact that a tire from the Ford automobile was thrown twenty-five feet to the right on the same side of the road, and that Aubrey Goldsby was thrown out of the automobile and outside of the trees on the right-hand side of the road.

Defendant sought to overcome the force of this testimony by that of thirteen witnesses to the effect that defendant's car was on the right-hand side of the road in the direction in which it was moving just prior to the collision.

This, in our opinion, is a fact, but it does not disprove the testimony of plaintiff's witnesses as to the point where the collision happened; for all of the witnesses, those of defendant as well as those of plaintiff, who testified on this point agree that defendant's car skidded to its left when it reached the twelve per cent curve in the road at the top of the grade near the point of collision.

Usually when an automobile begins to skid it turns half-way around unless it is prevented from doing so by striking some obstacle, and the occupants of the car skidding cannot tell the distance it has skidded, nor can that distance be ascertained from the markings of the automobile tires on a much traveled graveled road.

Jack Lowrey testified, pages 405, 406, 407.

"Q. Do you not know that that would necessarily throw the rear of your car considerably to the left, when you applied the brakes, going around a right-hand curve.

"A. It would, to a certain extent, yes, sir.

\* \* \* \*

"Q. Did you turn it sharp to the right and run into the bank?

"A. I don't think it hit the bank; it might have scraped the bank; when I got the front end past his car I turned the wheels to get the back end by; cut the wheels toward the center of the road.

\* \* \* \*

"Q. Now, where do you know that the car began to skid?

"A. Well, I don't know exactly. I would say just about the mail boxes or probably a little on the other side.

"Q. Did it skid any before you got to the mail boxes?

"A. No, sir.

"Q. Did you have the brakes applied before you got to the mail boxes?

"A. I don't think; no, sir.

"Q. When you applied your brakes was it after reaching the mail boxes, after you were going around the curve and down the hill to your right?

"A. That is correct.

"Q. Then you had no skidding of your car before you passed the mail boxes, is that correct?

"A. I think so.

"Q. How far did it skid, when you put the brakes on, before you got to the extreme bank of the ditch?

"A. I never did measure it; I could not say exactly.

"Q. Did it skid eight feet, ten?

"A. I said I didn't know exactly how far it skidded.

"Q. You testified that you cut your car to the right, sharply to the right, in order to avoid the Ford car?

"A. As far to the right as I could; I was already on their right.

"Q. That is what I say. Was that the time that you applied your brakes?

"A. No, sir; I applied the brakes a little before I cut the car.

"Q. You applied your brakes a little before; you applied your brakes and then you cut your car to the right, is that correct?

"A. I think so."

It is always dangerous, when an old car is being driven at a rapid rate of speed, to apply the brakes suddenly; the tires and brake-shoes do not wear exactly the same; and when one wheel is caught by one of the brake-shoes more firmly than the other the unexpected is always liable to happen.

In our opinion it is reckless and exceedingly dangerous for an automobile to be driven around a twelve per cent curve at the top of a grade at such a rate of speed as to cause the car, in case of collision with another, to turn around and land upside down eighty-four feet from the point of collision.

It is the duty of the driver of an automobile, in driving around a twelve per cent curve in a road at the top of a grade to have his car under control and thoroughly in hand.

Greene vs. Moore, 4 La. App. 494.

Reeves vs. Pyle, 3 La. App. 718.

Ellis vs. Colleta, 1 La. App. 369.

Such of defendant's witnesses as were riding in the Hudson car at the time of the collision testify that they saw the car in which plaintiff and her husband were riding on the wrong side of the road just beyond the point of collision; but in this they could very easily be mistaken. The car in which they were riding was being operated at a high rate of speed and the car in which plaintiff was riding was beyond the point of the twelve per cent curve from them; and under these conditions it would have been almost impossible for the occupants of the Hudson car to tell just what portion of the road plaintiff's car was on.

Defendant's learned counsel in an able supplemental brief have submitted a plat showing the locus in quo and have located thereon the respective positions of the two automobiles, as shown by copy of the plat attached thereto; and they insist with great earnestness that such a collision as is indicated by the plat would have thrown the automobiles into the positions in which they were found after the collision.

But this argument is flatly contradicted by the testimony of Jack Lowrey, the driver of defendant's car at the time of the accident, who testified, page 406:

"Q. Did you turn it sharp to the right and run into the bank?

"A. I don't think it hit the bank; when I got the front end past his car I turned the wheels to get the back end by. Cut the wheels toward the center of the road."

It necessarily follows that if defendant's son had gotten the front end of his car past plaintiff's husband's car and had turned the wheels to get the back end by, cut the wheels toward the center of the road, the automobiles could not have met as indicated on the diagram.

Jack Lowrey testified, pages 394, 395, 403, 404, 407:

"Q. Mr. Lowrey, how far was the Ford car from you when you first saw it?

"A. Well, I could not say; I never measured.

\* \* \* \*

"Q. Well, was it one hundred feet from you when you first saw it?

"A. Yes, sir.

"Q. How much more than that?

"A. Well, I don't know how much more; it was some, though.

\* \* \* \*

"Q. The way the Ford car was traveling when you first saw it, was it headed directly towards you or to your right or to your left?

"A. It was to my right you are talking about.

"Q. No, I am asking you.

"A. You mean—I am talking about mine, not his—my direction, I would say it was to my right a little.

"Q. A little to your right?

"A. Yes, sir.

"Q. About how much to your right?

"A. Well, I could not say exactly.

\* \* \* \*

"Q. How fast were you going on this occasion?

"A. I said between thirty and thirty-five miles per hour.

"Q. Where was your car when you applied the brakes, Mr. Lowrey?

"A. It was about the mail boxes.

\* \* \* \*

"Q. Do you not know that that would necessarily throw the rear of your car considerably to the left when you applied the brakes, going around a right-hand curve?

"A. It would to a certain extent, yes, sir.

\* \* \* \*

"Q. Did you have the brakes applied before you got to the mail boxes?

"A. I don't think, no, sir.

"Q. When you applied your brakes, was it after reaching the mail boxes, after you were going around the curve and down the hill to your right?

"A. That is correct.

"Q. Then you had no skidding of your car before you passed the mail boxes, is that correct?

"A. I think so.

"Q. How far did it skid when you put the brakes on before you got to the extreme bank of the ditch?

"A. I never did measure it; I could not say exactly.

"Q. Did it skid eight feet, ten feet?

"A. I said I didn't know exactly how far it skidded.

\* \* \* \*

"Q. You applied your brakes a little before; you applied your brakes and then you cut your car to the right; is that correct?

"A. I think so."

This evidence shows that defendant's son saw plaintiff's husband's car meeting him on the wrong side of the road more than one hundred feet away and made no effort to stop his car until he was within ten or twenty feet of the other car. This was gross negligence. But we have preferred not to decide the case on this point. In our opinion the law and the facts of this case are covered by the findings of the trial court that the point of collision was over on the right-hand side of the road in the direction in which plaintiff's husband was driving; and after reading all the evidence and the able briefs of counsel on both sides, we fully agree with the lower court in its findings of fact that plaintiff's husband was without fault at the time of the accident and that the fast driving by defendant's son of his automobile around a twelve per cent curve in the road at the top of a.

grade and sudden application of the brakes to his car was the proximate cause of the collision.

On the question of damages, our learned brother of the District Court, in summing up his reasons for fixing the amounts awarded plaintiff and her son, said:

"It is true that the deceased, Lawton Goldsby, was a young man and had been earning a good salary prior to having his leg broken; but there was no evidence to show that he would ever be able to earn that amount again in the future. It also developed that he had other ailments which might prove fatal. The time that he might be expected to live and the amount of his future earning capacity in the future would be a mere speculation at best. It was admitted by counsel for the plaintiff that under the circumstances they did not expect judgment for the full amount sued for, as the defendant was not present, nor did he contribute to the negligence of his son which caused the death of plaintiff's husband. In view of the plain letter of the law which makes parents responsible for the torts of their minor children, and under the facts in this case, for the injury done to the plaintiff and her minor child by the pain, suffering and injury of the deceased, and the loss of his love and support, it seems that they are entitled to recover judgment against the defendant and should have judgment in the sum of four thousand dollars for the plaintiff individually and the further sum of four thousand dollars in her capacity as tutrix for the use and benefit of the minor, Ralph Goldsby, and the further sum of two hundred and seventeen and 77-100 dollars in her own right and the sum of two hundred and seventeen and 77-100 dollars in her capacity as tutrix for the minor's use and benefit for the price of the Ford car destroyed in the wreck, with five per cent interest on said amount of eight thousand four hundred and thirty-three and 34-100 dollars from judicial demand until paid."

Under all the evidence on the question of amount of damages we see no reason for disturbing the amount of the award made by the court a qua.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be affirmed.